Mr. Harris. May it please the court. I'm Paul Harris. I, along with Robert McCoy, represent the appellant Allen G. Saoud. This criminal appeal arises from a 32-count second superseding indictment returned eight calendar days before trial in alleging various criminal acts relating to health care, taxes, bankruptcy, and identity theft. The appellant was a doctor of osteopathic medicine and began practicing in 1983 in the Clarksburg, West Virginia region. On August 11th of 2005, he entered into a voluntary settlement agreement with the federal government. It was a negotiated settlement wherein he was represented by a former United States attorney. He signed the agreement as well as his counsel. He admitted no liability but tendered the sum of approximately $300,000 to the federal government and voluntarily excluded himself from the federal health care programs including Medicare and Medicaid. The language of the agreement focused on a prohibition by Dr. Saoud from furnishing, ordering, or prescribing any services or anyone doing that billing for his services that he furnishes, orders, or prescribes relating to Medicare and Medicaid. After the execution of the agreement, he then split his dermatology practice. The agreement did not prohibit this. He sold part of his practice, the Medicare and Medicaid part, to his colleague, Dr. Fred Scott. And because they were colleagues, they did not use lawyers and they entered into a simple contract. Simple. Is that the one paragraph, two sentence contract for a million and a half dollars for the sale? Judge, very, very, very simple. No different than really a handshake deal, which lay people do all the time. Except that in this instance, Mr. Scott testified he never owned the entity and didn't remember signing anything. You're right, Judge Duncan. That's what he testified to. However, all of the tax returns that he signed, and it was undisputed that he signed for Central West Virginia under oath, said that the K-1, he was 100% shareholder of the company. And moreover, documents that he signed under oath that he submitted to the West Virginia Board of Osteopathic Medicine showed that he was and 100% owner of Central West Virginia Dermatology. And so the clear written evidence, it completely impeaches Dr. Scott with respect to his bald statement that he didn't own these entities. Moreover, on his personal returns, he took the information from the Central West Virginia Dermatology tax return, the K-1 information, put it on his own personal tax return. What incentive would he have to say he didn't own those entities that in fact he did own? To keep from being indicted and also to avoid civil liability in a case that the bankruptcy trustee had brought against him and Dr. Saud and others. Dr. Saud then continued to practice shortly under the existing entity, AGS Inc. There was no evidence in the case that he ever billed or furnished, ordered, or billed any services to Medicare and Medicaid inconsistent with his agreement. When the insurance carriers, as they do, determined that Dr. Saud had been debarred from Medicare Medicaid, they chose to no longer be involved with him and to provide reimbursement. That being the case, he then sold the remnants of his practice, AGS Inc., to a colleague who was a nurse practitioner by the name of Georgia Daniel, who was also a person who signed all of the tax returns related to AGS Inc. That's another one of those one-paragraph deals for a million dollars? Indeed, Judge. Another handshake deal. Indeed. In fact, these people practiced in this medical practice for a number of years, did very well economically, and in fact, all of the numbers show that- Well, Judge, it's been my experience, probably yours, that people in the health- I mean, I'm just wondering. I don't want to say this is unique to West Virginia, but I mean- I think it says something about- I haven't seen it here. I think it says something about doctors, Judge, at least in West Virginia, perhaps. Well, Ms. Daniels wasn't even a doctor. It's Ms. Daniels, and she was a nurse practitioner, Judge, but the idea was she would take that entity and flip it to an LLC, nurse practitioner LLC, which she was perfectly allowed to do. She got all of the money from AGS Inc. We showed at trial her tax returns zoomed up with respect to income, hence her motivation for taking AGS Inc. But Mr. Harris, the jury heard that argument and they saw the tax returns, and weren't they free to decide as a matter of credibility that those tax returns were shams? Judge, you're correct. We have a tremendous hurdle to overcome with respect to the sufficiency of evidence argument related to those issues. But we believe that coupled with the plain language of the settlement agreement from 2005 shows that all of the documents overwhelmingly show that Dr. Saud did not commit healthcare fraud. We recognize it's an enormous burden to overcome, but the thrust really of this appeal, despite all of the many issues in the briefs, the thrust really of this appeal is we maintain the abuse of discretion by the trial court in the case. The proceeding indictment was returned eight days before trial. The important thing to remember, Your Honors, is the indictment was returned December 4th, 2012. In January, the trial court entered a scheduling order and said, this is a complex case. It was a joint motion by the parties. This is a complex case. It involves many boxes. I think the government estimated 50 banker boxes. The parties will need time to review the evidence and retain experts. So the trial was then scheduled for June 12th of 2013. The important thing to remember also is in May, early May, I think it was May 7th of 2013, the first superseding indictment was returned. It added some language related to a regulation in the 5% ownership issue. We reviewed that. And in the record, the next day, we filed a pleading, which was a notice, which says, in light of the superseding indictment, we still want to have the trial of June 12th, 2013. So there's no indication that the defense at any point in time wanted a delay. It was only until the second superseding indictment came out, which added nine new counts, that caused us to file our motion to sever or our motion for continuance within 70 days for the trial. And with respect to that motion, what was the evidence that you submitted in support of your claim that you needed more time to prepare? Specifically, what additional witnesses were you inclined to interview? What documents, what experts? Did you actually present that evidence to the district court? Judge, what we did is in the quick, it was a hurry up motion and brief, because it was on the heels of the trial. I mean, the second superseding indictment came June 4th. Dr. Sode was arraigned again on June 5th. And I believe we filed our motion June 6th, very, very quickly. Yes, because we wanted to get that issue before the court. We said we believe we need to retain an expert, because this is a unique issue now. The new health care fraud counts don't relate to what the existing counts in the indictment related to. It involves a new person. It involves a whole new theory related to the laboratory within the practices, and whether that billing was done appropriately or not. Well, the question, as I understood it, is whether or not Dr. Sode, is that correct? Yes, Your Honor. Wrongfully used Dr. Swisher's identity. You were available. You were certainly able to cross. You would have certainly been able to cross. And you had Dr. Swisher's, the invoices and the testimony that were in the record. I'm not quite sure what you would have done or what the prejudice was. And the district court found no undue prejudice in that subject to the use of discretion. But Judge, that would be the case if we sat back and did not bring forward evidence in the defense to counteract each of these counts in the complaint. The record shows, for example, on the first five counts, we brought in two lawyers that were involved in those transactions to testify. We had an expert accountant. We had an expert tax lawyer for all of the other issues in the case. So the defense was bolstered by the use of experts. And to be perfectly candid, Your Honor, when the new counts came down, as a responsible lawyer, it was our obligation to review all of the existing documents to see what is in there that can be used to cross-examine the new witnesses or witness related to these issues. And we were completely unprepared with respect to that issue. We can stand up and cross-examine a witness. Anyone can do that, Judge. The key to effectively cross-examining the witness so that the client prevails is to do effective cross-examination. And in a white-collar case like this, with 200,000 pieces of paper, and you're still getting them during the trial, you have to know those pieces of paper in order to determine what to use to cross-examine the witness. The other thing is the new counts in the indictment added a whole new concept of aggravated identity theft, which carries a mandatory two-year prison sentence. That wasn't in the two previous indictments. They added a new concept of aiding and abetting under 18 U.S.C. Section 2. That wasn't in the two previous indictments. The government had no obligation to give us notice that there was going to be another indictment coming down. They don't have that obligation. But if they had, then we would have started getting prepared once we got that notice. But it's inconceivable in a case that already contains 23 counts, that eight days before trial, you add nine more counts on unique theories that didn't relate to the other issues in the case and expect counsel to be adequately prepared. We didn't have time to interview witnesses. We briefly interviewed Dr. Swisher, briefly interviewed him via telephone, didn't even get to meet him, to go over documents with him. That's all we could do. We learned shortly before trial that his wife was instrumental in preparing the Medicare application. We didn't have the chance to call her. We're certainly not going to put a witness on that. We don't know what the witness is going to say in a criminal defense like this. So we had six months to prepare for the first 23 counts, and we were prepared. And that shows because of the first superseding indictment. We didn't ask for a continuing stand. Then we only had eight days for the last nine or the new nine counts on a theory of which we had no idea. And it's easy for the government to say all of that information was in the documents that was already presented to us. We get the documents on disk. That's the way things are done these days. I started, and you all started when you got the hard copies. You got to take them to the office. I'm not sure I appreciate them. I apologize, Judge. But you got to take the disk to your office. You got to print the thousands of pages out. And you're getting these shortly before trial, and you're getting new disks at trial. And it's maddening. So I want to make certain that I'm abundantly clear with respect to the issue of the factual difference between the new health care counts and the old health care counts. The old health care counts focused on this issue of ownership and control. The new health care counts focused on an issue of billing, which raises a whole new spectrum of how you deal with these issues. Because with the old health care counts, there's no dispute that Dr. Sahu did not bill, furnish, or purchase any services for any clients. But the end result of what your argument seems to be is that because you were forced to go to trial earlier, you went in a state of unreadiness. Is that correct? Judge Wayne, I hate to admit it, but it's the first time in 27 years I was not prepared. And that, in and of itself, implicates Sixth Amendment rights or Fifth Amendment rights? Well, I think judges both. I think you have a Sixth Amendment right to not only counsel, but the effective assistance of counsel. So it isn't enough to just have a lawyer. The lawyer has to be adequately prepared. I think the US Supreme Court- Effective assistance, I guess you would basically say there was ineffective assistance of counsel, particularly when you're dealing, as we are in the direct field now, you don't want to get up now and probably argue you were ineffective at the trial. So it's sort of a tongue-in-cheek thing for you. But at this stage, dealing with the Sixth Amendment right to counsel and maybe due process in the Fifth Amendment, you do have a high burden, first, in terms of abuse of discretion standards, but also that you have to point to specific precedents. And that's the key. What is specific prejudice? Is it that you have, like, as in the little roach case that we wrote, it seems that some of them lay out what specific prejudice is. And it goes to the question of, there were some things you did at trial that may have been error that resulted from this. What did you do? Well, I didn't do that.  Here's an absolute clear case, Jeff. With respect to the new count, count 14, the aggravated identity theft, it's abundantly clear, in our opinion, that the trial court constructively amended the indictment by including the first five counts of the health care fraud when the indictment itself, the plain language of count 14, only dealt with Dr. Swisher and counts, the new counts, 6 through 13. That's a different claim. Did you raise that? I didn't. Oh, yeah. I raised it in the brief indirectly by saying our burden was incurred before the trial court. Not before the trial court, Judge. But it's error per se under the holdings in this circuit, under U.S. versus Randall, that the trial counsel doesn't even have to object when an instruction constructively amends the indictment. And that's a Fifth Amendment violation, Judge Winn, with respect to that. That was a problem because, and my job is to represent my client and to represent my client effectively. That's the difference between a lawyer being a professional and a person that just makes money. I was not prepared to deal with these new counts. Mr. Harris, thank you. You have some time to move on. Thank you, Judge. Mr. Coker? Thank you, Your Honor. Your Honor, may it please the court, counsel. My name is Andrew Coker. I represent the United States in this matter. Your Honors, I'll focus in on the arguments with respect to the motion to continue and sever the trial, or in this case, the trial court's denial of that motion. I think, Judge Winn, you raised the key point with respect to this issue, and that is, what's the standard of review and how does it apply in this case? And as the LaRoche case made very clear, I think that may have been the first case that articulated the standard of review for a motion or denial of a motion to continue trial. It's very high. It's very high, Judge. But on the other hand, you've got all these 200-some-odd thousand pages of information. You've got your counts and the government. I'm just thinking in terms for counsel to stand before us and say, this made them unready. I'm just wondering, in the scheme of things, you come in and you add some more charges on to it. Why wouldn't you just agree to it? Well, Judge, it's a little extra time to prepare. I understand the court's question. I understand the defendant's position on that. And I think some context would be helpful. In context, almost all the information that was used to substantiate the new charges in the second superseding indictment, except for Dr. Swisher's interview, which occurred about a month or three weeks or so before trial started as part of the trial preparation process. Almost all of this information was already disclosed to the defendant approximately six months before trial started. Well, but you had it, too. And it took you quite a long time to figure out that you needed to allege or submit additional charges. And that was just that they needed some additional time to respond. That's a good point, Judge Diaz. And I'll just add that, with perspective, the key, the load start of that, what was the catalyst to the new charges was the actual interview of Dr. Swisher himself. Because basically, what we had in discovery was we had billings that were issued from the practice that the defendant was involved in, Central West Virginia Dermatology. Those billings, the relevant ones, showed that Dr. Frank Swisher provided certain pathological services. So we saw this at the outset of our review of the discovery very early on. We assumed that, from other documentation, again, within that same initial disclosures, we assumed that Dr. Swisher actually provided those services. As we went forward to trial, we wanted to talk to Dr. Swisher because he's one of the few doctors that was associated with the practice before it closed down. And we thought he might be called by the defense. So we reached out to him and asked him about the billings. He advised us for the first time that he didn't provide those services, that he was merely the lab director. And it was just that simple fact. And candidly, Judge, the facts relating to this issue are very simple. And that's what the district court found as well. But it was just that simple fact that turned on the actual need for, prompted the government to seek superseding charges on that issue. So at bottom, that's one thing that was persuasive to the district court. That's one thing that the district court considered. And that is something that belies the claim that an expert was needed or more time was needed to sift through these thousands of more pages of documents. So that one change in the facts was the catalyst or foundation for all of the counts of the superseding indictment? Yes, Your Honor. Yes, Your Honor. There was basically two categories of charges that were in the new second superseding indictment. There was a health care fraud count, and that related to, I believe, seven or eight separate billings. But in materiality, they were all the same types of things. If you saw one, you'd seen them all. And they all had Dr. Swisher as the provider of the services when, in fact, he had not provided that service. And then the other count, the other category was the aggravated identity theft charge, which related to the unlawful transfer of Dr. Swisher's identity without his knowledge to bill those services. How many additional documents were presented to the defense after the superseding indictment was handed down? Well, I can't quantify exactly, but I will say this. There was very few of them that related to the new charges. Well, it doesn't matter. I mean, if they're new, they're new, and they need some time to sift through them. His point is, in order to be effective, you needed time to be able to sift through these additional documents to determine whether or not witnesses needed to be interviewed and recalled, and whether or not to retain an expert witness. And that's awfully tough to do on the eve of trial when you're inundated with documents and non-additional counts. I understand, Judge. The evidence, though, would have been disclosed to, discovery would have been disclosed irrespective of the second superseding indictment. So that claim could have been lodged with respect to the initial charges as well. I guess I don't understand this. What was the, why was there a brick method of disclosure here? They were, it was supplemental disclosures. They were, there's been no allegations of any discovery violations in this case. We received, we did trial subpoenas for documents, which came in much later than expected. And as we got it, we turned it over. And with respect to the discovery, I think it's important, I want to, I'd like to dovetail back into the standard review argument, because I think it's relevant to that. And as the specific prejudice, because notwithstanding all the conclusory allegations of, well, we did not have enough time to review these documents. And yes, we were flooded with documents before trial or during trial. And I think that I would also refute the categorization that there was thousands of documents or pages of documents provided just before or during trial. But be that as it may. Well, in terms of the review, and that's kind of the point, I'm trying to understand it. It looks to me, it sort of creates almost a harmless error type standard. It says, you know, even if there were some problems here, you got to show specific prejudice. And to show specific prejudice, you got to point to specific errors at trial that will affect the trial so much that it would affect the outcome from the juror's perspective. That's a pretty high bar from the beginning, starting with it. I mean, you've got a case of all the things you've mentioned. It wasn't on an aggravated identity theft. It doesn't seem to tie in with bankruptcy or much of anything else. It seems like to me that might have been a good basis to give some more time, because it's sort of different from the rest of them. But nonetheless, if, you know, I'm sort of dealing with this whole business of counsel is representing unreadiness, the fact that you've got this, all this information is there. And yet, if this is our review, and this is a Fourth Circuit case that says this, you know, everything we just said doesn't mean anything. All you've got to do is just go to the trial and tell me what happened in here. Maybe you should have had more time. But once the trial's over, you did a pretty good job in that little short time. So show me what happened that specifically didn't do it. Now, opposing counsel did a point when I brought that up. He pointed to one thing. Would you address that? Certainly. And I believe that dealt with the trial court's jury instruction. I should say at least one thing. Correct. But with respect to the identifiable error, we'll say, or oversight or problem that, in retrospect, defense counsel had with what happened in view of the new charges and in view of the new discovery, I understand that he's pointing to, in response to that question, trial court's instruction with respect to the aggravated identity theft. Based on my review of the record, I could not find any objection to that obstruction or that instruction during the charge conference number one. I may have missed it. But based on my review of the record, I could not find it. Secondly, the instruction was correct. If the court looks at the indictment itself with respect to the aggravated identity theft charge, the opening paragraph of that charge. Maybe if you had more time to appear, he'd have known to object. Well, that was a week in the trial, Judge. So I don't know if that excuse holds. But in any event, if you look at the actual charge in the second superseding indictment with respect to the aggravated identity theft, the opening paragraph of that charge incorporates the previous paragraphs of the indictment, which incorporates both sets of the health care fraud charges, both the original set, which was again incorporated in the jury instruction, and also the set that was included in the second superseding indictment as well. As I understood it, he was upset because the inclusion of all in the jury instruction was incorrect because it referenced all 13 counts. It referenced identity theft with respect to all 13 counts, and it only related to seven. Not that it was incorrect, but that it only implicated a subset of the counts. Right, and the government would respond that, to the contrary, the aggravated identity theft charge related to all of the health care fraud charges, in as much as it showed a couple things. First of all, the pathology lab income that was at the heart of the new charges, and was also a part of the old charges as well. It was cited in the original indictment with respect to the scheme, in as much as the defendant unlawfully obtained pathology lab profits, there was a lot of evidence in trial from an assortment of witnesses with respect to the defendant's interest in continuing income from the pathology lab. And in context of the broader scheme, that's the reason why the defendant went to Dr. Swisher to begin with, to solicit his help, so to speak, to be the lab director, to have that lab director in place. And then he, in turn, got his provider number and used it to bill without Dr. Swisher's knowledge. So the other aspect of the aggravated identity theft charge that applies to the totality of the health care charges in the case, including the original health care fraud charges, is the idea that the defendant was not supposed to be involved at all with Central West Virginia dermatology. This case is not about the defendant abiding by the language of the exclusion agreement per se. It's also about his circumvention of that exclusion agreement with respect to the control and ownership restrictions of that practice and AGS, the other practice at issue. So when the defendant goes to Dr. Swisher and solicits him to be the lab director for Central West Virginia dermatology, that's evidence that he's, in fact, more involved with that practice than he should be under federal law. So there is a substantial connection and intertwining of all those charges. But with respect to the standard of view, though, overarching all of this, Judge Nguyen's well taken, that the specific prejudice prong of the analysis, and I'll just note as well that there are two prongs to the standard of review. There's first the abuse of discretion, and then there's secondly the specific prejudice. As to the first prong, it's more of a contemporaneous analysis. It's what the court observed and what the court was presented with at the time that she made that decision. And on that score, the district court, as it was noted earlier, asked pointedly, where is the undue prejudice here? And defense counsel failed to identify anything specifically to that score. The thrust of the argument at that point was I did not have enough time to prepare. I did not have enough time to review all the documents. But as the LaRoche case points out, that's not enough. You have to go for specific prejudice, which is the next prong I'll get to in a minute. There has to be more than that. But if you look at just the first prong and the abuse of discretion standard, and you look at the court's analysis, the district court's approach, we'll say, to the issue, the district court heard our counsel on this issue and again found that there was not prejudice before going to trial. But there's also the matter of the post-trial motions, in which having the benefit of going through the trial proceedings, both from the defense standpoint and also from the court's standpoint, again, found that a new trial was not appropriate and denied the post-trial motion to that end, finding that, again, there was no prejudice and that the motion to continue was properly denied because the new charges related to the old charges in the original indictment. They occurred during the same time frame as the originally charged conduct. They didn't present any complicated issues and they didn't require an expert witness. Now, this is from, again, the trial court that observed all the evidence at trial and considered the arguments of counsel on the issue. And another point on this issue, which I think is important because it's undisputed in this case, is that irrespective of the challenges that the defense counsel claims to have had with respect to getting up to speed on these new charges, defense counsel has at no point challenged the admissibility, the underlying admissibility of all of the evidence that was used to support the new charges in the second superseding indictment. Was the volume of documentation, the 200,000 documents that the defendant refers to, was it some subset of that that related to the new counts? I'm a little unclear about what that number is with respect to the new counts of the second superseding indictment. It was. It was an identifiable subset, which the government tried to make clear to the defense immediately after the second superseding indictment. But as I understood your answer to Judge Diaz, you can't quantify that. No, but what I can do is I can quantify the number of pages with respect to the exhibits that were actually admitted to trial by the government. I think that's also helpful for purposes of context, because you see that with respect to the second superseding indictment, the government admitted of approximately 79 exhibits, approximately just six of those related to the new charges. Of those six exhibits, four of them were disclosed six months before trial in the initial disclosures. Two of them were based on the new evidence that was obtained following the revelation by Dr. Swisher. Those two exhibits that were not previously disclosed to counsel were disclosed approximately a week to two weeks before trial. And of those two exhibits, one was a summary chart that was one page long. The other one was an exhibit of 88 pages, I believe, of checks that were written to Dr. Swisher. And once you'd seen that were deposited by the medical practice as part of the billing, that was how the billing agencies... So Dr. So knew what you thought was relevant and important, but counsel's argument is that it was their right to figure out for themselves what else in that larger subset of documents might have been relevant and important to their defense. Correct, Your Honor. And I think that's what speaks to the next prong of the standard review, and that's the specific prejudice. Because the specific prejudice prong, unlike the abuse of discretion prong, is more retrospective in its analysis. In this prong, it traps the Strickland v. Washington ineffective assistance counsel analysis as it relates to the prejudice prong of that analysis. And in that analysis, as it relates to this case, it's asking the question, the key question is, was there an oversight, an error, a mistake by counsel as a result of proceeding to trial which tended to undermine the confidence in the outcome? Well, wasn't Dr. Sywood convicted on the majority of these counts in the superseding indictment? Yes, Your Honor. He was convicted on all the healthcare fraud counts, including the original ones, in addition to several of the bankruptcy fraud counts, and one of the tax counts, and also the aggravated identity theft count. He was acquitted on some? He was acquitted on some of the bankruptcy fraud counts. Those are all in the original indictment, right? Yes, Your Honor. Okay. Doesn't that suggest that it might have made a difference? Well, that in itself does not meet the burden under the LaRoche standard. The counsel has to point to, especially given the benefit of a year, a year and a half now that we had trial, counsel has to point to a specific oversight error that could have changed the result. Not the fact that the result itself was not to his liking. Not the fact that he would have liked more time. That's not the standard. Not the fact that he had a lot of work to do, more work to do, leading up to trial. That's not the standard. The LaRoche case does a great job of outlining what specific prejudice means and what defense is required. Kevin's this case. Kevin's the way in which these cases are presented. We talked about ineffectiveness. And Sheila was not talking about ineffectiveness that's born from the fact that the counsel's not doing the noted job. Counsel's alleged here is ineffectiveness because I was put in a position where that's the best that could be done. I was put there because I wasn't ready. And so the court forced me to go, which rendered my services ineffective. But I would have been effective had you given me more time. So it kind of puts in a different vein than the Strickland type analysis of ineffectiveness. And it's interesting as I'm listening what's going on here, but you're right. I think that the LaRoche case cabins this thing in a way. It's almost, you start with, even if there is an abuse of discretion, you could almost do like you do in the cases dealing with qualified immunity. Just go to that second problem and just deal with it. I don't know how you overcome it unless you can show something specific there in that record. It seems to be pretty spectrum. I agree, Judge. In other words, you would have to say, OK, now that we've had a chance to look at the documents that we didn't have a chance to thoroughly review before trial, we found this document that would have been exculpatory or that would have significantly changed the dynamic of the cross-examination of Dr. Swisher, for example. That's never been presented at any point, even to this day. So without that, Your Honor, there can't be specific prejudice. And for that reason, the government would contend that under both prongs, the abuse of discretion, the court did not arbitrarily proceed on the trial, and that the defendant has failed to establish any specific prejudice in the case. And for that reason, for the other reasons in our brief, we would ask this court to affirm the lower court's decision. Thank you. Mr. Harris, you were sourced at time for rebuttal. Thank you, Your Honor. We did not expect a perfect trial. We don't think we're entitled to have a perfect trial, but we are entitled to have a fair trial. And one of the hallmarks of having a fair trial is the ability to access witnesses, to bring them to court, to have them testify on your behalf. In counts 8 through 13 of the second superseding indictment, the new counts, there are individuals listed by initial, initial only. After that time, the government said, these are the names of the people. We had no way of contacting them or locating them. There were no addresses, no phone numbers. And we're not saying the government did that intentionally, but it became part of the problem when the court didn't grant a continuance within 70 days, when we had never asked for a continuance before. There was reference in the new counts to Kaiser Permanente Healthcare, right? And the issue was, what was the propriety of submitting these documents for reimbursement when Dr. Swisher was deemed to be the, quote, administrator of the lab and didn't see the patients? Well, we had no way of contacting Kaiser Permanente with respect to those specific documents in the new count. That, for them, would have been looking for a needle in the haystack. But that could have been exculpatory to say, this is done all the time. An administrator of a lab doesn't have to see patients as long as a healthcare professional sees the patient and doesn't upcode and doesn't phantom bill. What prevented you from doing some of this post-trial, as the cover suggests? Well, by then, the trial is over, and you have to deal with the very difficult issues of sentencing. And dealing with the client and his family, you know, Dr. Sode was a professional. The newspaper, the TV was there every day during the trial. This was a big deal. And those sorts of things cannot be discounted. And so were it the case that we were with a huge firm, we would be able to scour the countryside to try and find this information out. But from a practical standpoint, you have to prioritize once the guilty verdict comes in. And we think that we preserve this issue of not having sufficient time. We think that the court should look to the U.S. versus Rojas Contreras case in Justice Blackmun's concurrence, where he says specifically, in the event of additional charges, a defendant may well need additional preparation time. We had that here. The constitutional right to assistance of counsel is rendered meaningless if a defendant  We weren't even asking for the court to put off the trial with respect to the original counts. We were ready to go on those. It's these new counts, which we believe deprived us of a fair trial, not a perfect trial. We're not entitled to that, but a fair trial. And the other thing is, with respect to Dr. Swisher, he was identified as a witness on May 29th, five days before the second superseding indictment came out. He, along with hundreds of other people, his name is contained in those hundreds of thousands of pieces of paper. There was no way for us to know that up until May 29th of 2013, that Dr. Swisher had anything in the world to do with this case whatsoever. And all we could get was a telephone interview and not show him documents because we hadn't seen him yet. And finally, it's a bit disingenuous to say we already had the documents relating to Dr. Swisher. First of all, we didn't because we kept getting disks. There's a way for us to quantify the number of pages if we go back and we can do that. And if the court wants to submit a supplemental brief related to that. But the point is, we can't figure out as we're preparing for trial, which pages are going to relate to an indictment on counts that hasn't even happened. It's difficult enough to predict a witness's testimony if you can't or oftentimes don't have the ability to interview the witness beforehand. But it's the lawyer's job to get prepared and interview and find every witness that could possibly support the defense. And in these cases, it isn't when you defend them, as I know your honors know, the government has to prove beyond a reasonable doubt each and every element of the crime alleged. And so sometimes getting an acquittal on one count like one of the tax counts related to focusing just on one piece of paper or one element of the crime within the confines of the indictment. We couldn't do that with the new indictment. So your honors, I'm grateful that you're hearing us and we appreciate the time. And we ask that this case be reversed and that we have the opportunity, just as we got an acquittal on 10 counts from the original indictment, that we have the opportunity to properly prepare and try these remaining counts. Thank you. Thank you very much, Mr. Harris. I would ask the courtroom deputy to adjourn court sine die. And then we will come down and go to counsel. And we will briefly conference these cases. And if there's any time remaining before lunch and there are students around who would like to ask us questions, we'd be happy to do that with the understanding that, of course, we cannot discuss any of the cases that we've heard this morning. Thank you.
judges: Allyson K. Duncan, James A. Wynn, Jr., Albert Diaz